AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

765 SOUTH MAIN STREET, FRANKLIN, OHIO 45005
[INCLUDING ALL OUTBUILDINGS AND CURTILAGE]

)
)
)
)
)
)

Case No. 1:19MJ-088

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

[SEE ATTACHMENT A-1]

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized):*

[SEE ATTACHMENT B]

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371 | Conspiracy |
| 26 U.S.C. 5841, 5861(d), 5871 | Possession of an Unregistered Destructive Device |

The application is based on these facts:

[SEE ATTACHED AFFIDAVIT]

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**TFO BRADLEY MEEKER (FBI)**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/8/19

City and state: Cincinnati, Ohio

_____
*Judge's signature*

**HONORABLE KAREN L. LITKOVITZ**
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Bradley A. Meeker, being duly sworn, depose and state the following:

### I.

### INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am engaged in the enforcement of criminal laws and am within a category of officers authorized by the Attorney General to request and execute search warrants pursuant to Title 18, United States Code (U.S.C.), Sections 3052 and 3107.

2.      I am a Task Force Officer with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, Cincinnati Division, and have been since 2017. I have been a police officer for 21 years having graduated from the Dayton Police Academy in October 1997. I was assigned to Patrol Operations for approximately six years. In 2004, I was transferred to Investigations and worked as a general assignment detective for one year investigating property crimes such as theft and burglary. In 2005, I was transferred to the Forgery Squad and investigated forgery, identity theft, and embezzlement cases. In 2008, I was transferred to the Homicide Squad where I investigated homicide, felonious assault and assault cases. In 2009, I transferred to the Dayton Fire Department's Arson Unit. While there I determined cause and origin of fires along with investigating all arson fires. I returned to the Dayton Police Department in 2010 where I spent two years in Patrol Operations before being transferred to the West Patrol Operations Division (WPOD) detective squad. As a WPOD detective I investigated robbery, aggravated burglary and burglary cases. In 2017, I was assigned to the FBI's Joint Terrorism Task Force (JTTF). I have received training in national security and criminal investigations, and have conducted

investigations related to domestic and international terrorism for the past year. As a part of these investigations, I have participated in electronic and physical surveillance, records analysis, and have supervised the activities of informants who have provided information and assistance on subjects of investigation. Based on my training and experience, I am familiar with federal laws related to firearms, and I am aware that it is a violation of federal law to receive or possess a destructive device in violation of Title 26 of the United States Code.

## II.

## PURPOSE OF AFFIDAVIT

3.      I am currently participating in an FBI investigation of suspected firearms offenses, namely, 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm) and 18 U.S.C. § 371 (Conspiracy to Possess an Unregistered Firearm), by Randy D. KING and Richard D. GOODMAN in the Southern District of Ohio. The investigation is being conducted by the FBI Joint Terrorism Task Force, Cincinnati Division. I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, conclusions I have reached based on my training and experience, and upon information I have received from witnesses and other FBI agents who have been participating in this and similar investigations.

4.      This Affidavit is submitted in support of Applications for Search Warrants under Rule 41 of the Federal Rules of Criminal Procedure for search warrants for the following:

a.      **765 South Main Street Franklin, Ohio 45005** (hereinafter referred to as "SUBJECT PREMISES 1" and more fully described in Attachment A-1 hereto);

b.      **8550 Brown Road Ripley, Ohio 45167** (hereinafter referred to as the "**SUBJECT PREMISES 2**" and more fully described in Attachment A-2 hereto).

Based on the information below, I submit there is probable cause to believe that **SUBJECT PREMISES 1 and 2** will contain evidence, as more fully identified in Attachment B, of violations of federal law, including, but not limited to, Title 26, United States Code, Section 5861(d) (Possession of an Unregistered Firearm), and Title 18, United States Code, Section 371 (Conspiracy to Commit an Offense Against the United States, namely, Possession of an Unregistered Firearm).

5.     Because this Affidavit is submitted in support of the Application of the United States to search **SUBJECT PREMISES 1 and 2**, it does not include every fact known concerning this investigation. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

### III.

### PERTINENT FEDERAL CRIMINAL STATUTE

6.     Title 26 U.S.C. § 5861(d) states that it is unlawful for any person to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record, which is the central registry for all National Firearms Act (NFA) firearms in the United States.

### IV.

### DEFINITIONS

7.     The following definitions apply to this Affidavit and Attachment B to this Affidavit:

    a.    **"Firearm"** as defined in Title 26 U.S.C. § 5845(a)(8), includes a destructive device.

    b.    **"Destructive device"** as defined in Title 26 U.S.C. § 5845(f), includes (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a

3

propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device.

## V.

### FACTS SUPPORTING PROBABLE CAUSE

8.      In the course of this investigation, the FBI has utilized a Confidential Human Source ("CHS") who has provided reliable, corroborated information to law enforcement in the past. Based upon information received from the CHS, I have learned that Ryan D. KING ("KING") and Randy D. GOODMAN ("GOODMAN") are members of the United Sheepdogs of Ohio, (hereinafter, "Sheepdogs") a militia group whose roughly 12 members live throughout southern Ohio. GOODMAN is currently the defacto leader of the Sheepdogs group, until an official leader is voted on by the group. KING, who resides at **765 South Main Street, Franklin, Ohio 45005**, has participated in numerous Sheepdogs training sessions in the last six months. The training sessions have been held at various locations throughout southern Ohio, including the Deadwood Guns and Ammo range in Carlisle, Ohio. The group also trains at **8550 Brown Road Ripley, Ohio 45167**, a farm property which is owned by Bonnie S. Beath, the mother of Randy D. GOODMAN. This property is also believed to be GOODMAN's primary residence. Sheepdogs trainings have included the practicing of long and short range shooting, along with discussions regarding survival skills, first aid, communications, and firearms.

9.      Over the past seven months, the CHS has attended a number of Sheepdogs training and social events where KING, GOODMAN and the CHS discussed the construction of explosive devices and the possible destructive capability of the devices, if initiated. During this time, the

CHS also has participated in telephone conversations and Telegram[1] texting with KING and GOODMAN in which they have discussed and exchanged pictures of components to be used in explosive devices. For example, based on information from the CHS:

a. During a Sheepdogs training session held at **8550 Brown Road Ripley, Ohio**, in May 2018, GOODMAN told the CHS that Sheepdogs members placed tannerite, mixed with fuel and fertilizer, into a large tree. The tannerite was then initiated by means of a high velocity bullet. GOODMAN forwarded a video of the explosion to the CHS.

b. On September 20, 2018, the CHS, KING and GOODMAN attended a training session for the Sheepdogs. The training was held on the property of GOODMAN, near Ripley, Ohio. During the training KING made a comment that he made his own flares, and "other things." Later, following the training, KING went into further detail about what he built. KING stated that he buys fireworks and modifies them. KING stated he also built a claymore which was activated with a pressure switch. (Based on my training and experience, I am aware that a claymore is an anti-personnel mine.) KING described other explosives he has built as being made out of PVC pipe in two sections, one containing Pyrodex as the main charge, the other containing BBs as shrapnel. KING stated that he closed the pipe with a threaded end cap with a hole drilled for a fuse, and then a timer with a battery was used for initiation.

c. KING stated that he had built remotely initiated devices in the past, and told a story of how as a young man he made a remote activated explosive and put it underneath a raccoon killed as roadkill. The device did not go off at first, but when KING went to check on it, it detonated, severely injuring his hand. KING stated that he made a promise to God that if he did not lose his hand, he would not build any more explosives. However, KING laughed and stated that he is still building explosives. The CHS stated that KING held up his right hand which showed obvious scarring. KING stated that he buys Pyrodex online, which he also uses for reloading ammunition.

10. On October 12, 2018, the CHS traveled to Kentucky to the Knob Creek Machine Gun shoot along with KING and GOODMAN. The CHS consensually recorded the trip which included the drive as well as parts of the event. While at the event, the CHS witnessed KING purchase a wire assembly and inert grenades. The CHS also witnessed KING show interest in a

---

[1] Telegram is a cloud-based messaging application which allows users to send messages, photos, videos and files of any type. Telegram also allows users to utilize the application on all devices at the same time, including phones, tablets and computers.

vendor that was selling fireworks and energetic precursor powders. KING made a statement that he already had all kinds of fusing, but did ask a vendor about quick match fusing.

11.     During the ride back home on October 12, 2018, KING, GOODMAN and the CHS had a lengthy discussion about different types of explosives, fusing methods and initiation methods, including remote detonation. KING stated, "If we want to get real lethal, it's up to the leadership of our group, we can get pipe nipples and pipe caps and build our devices inside those, make them small, compact, deadly." GOODMAN commented that would make them an elite group. KING laughed and agreed but told GOODMAN this is not for "every Tom, Dick and Harry making them or passing them out." KING later described how a device could be wired to a wireless motion sensor, which when triggered, could set off a blast. KING and GOODMAN also discussed using a low order explosive, such as what KING referred to as a "crater maker," to initiate a tannerite explosive, rather than using a rifle shot. KING asked GOODMAN, "What do you think about the possibility of three of us making up a couple of things?" GOODMAN remarked that he didn't have a problem with it. KING then said, "When the shit hits the fan, if it ever does, we're not going to have time to sit around and manufacture shit, we're going to need it."

12.     On October 23, 2018, the CHS participated in a consensually recorded telephone conversation with GOODMAN at telephone number (513) 460-5769. During this conversation, GOODMAN told the CHS that he had been at a "buddy's" farm on the previous day. GOODMAN said that inside a barn on the property, he saw an unused pallet of ammonium nitrate, which his associate had previously acquired for use in tobacco farming. GOODMAN told the CHS that his associate was never going to use the ammonium nitrate, and that GOODMAN intended to take it. GOODMAN stated that he had a "recipe" for using the ammonium nitrate. (Based on my training

and experience, I am aware that ammonium nitrate is a commonly used agricultural fertilizer, as well as a highly explosive chemical compound.)

13.     Between October 26 and October 28, 2018, the CHS attended a Sheepdogs Militia training at **8550 Brown Road, Ripley, Ohio**. The CHS consensually recorded during different times throughout the three days. At the conclusion of the training, the CHS spent time alone with KING where KING talked about building explosives. The topic included the materials that would be used and KING showed the CHS an image on his phone of a remote controlled relay switch. Before the CHS left GOODMAN's property, the CHS, KING and GOODMAN had a further conversation alone. GOODMAN again discussed a "buddy" who had a recipe for making explosives out of ammonium nitrate. KING expressed interest in GOODMAN obtaining the recipe from his "buddy." Just before he departed, KING stated to the CHS and GOODMAN, "When are we going to start building these things?" It was then decided that since KING was the busiest of the three of them, he should decide when they get started.

14.     On the evening of October 31, 2018, the CHS spoke with GOODMAN by phone and GOODMAN stated that he had not yet gotten the "recipe" (for fertilizer-based explosives) from his buddy. When the CHS asked if GOODMAN had talked to his friend about obtaining the pallet of ammonium nitrate, GOODMAN responded that he had not, and that he would just take it when he wanted it. GOODMAN then stated that he was getting excited about making things and went on to say that KING was going to have to show him how, because he did not know how to make them.

15.     On December 8, 2018, the CHS attended the Sheepdogs Christmas party, which was held at KING's house, **765 South Main Street, Franklin, Ohio (SUBJECT PREMISES 1)**.

7

It was previously arranged that GOODMAN and the CHS would meet KING at his house, before the other members arrived for the party. The CHS drove GOODMAN to and from the party, recording both drives and the meeting with KING. KING, GOODMAN and the CHS were seated inside KING's house at a table where they looked at parts, including a steel pipe with end caps, e-match, and wireless relays. KING, GOODMAN and the CHS discussed for over an hour different types of ignition systems, including mechanical and wireless, along with discussing designs for destructive devices.

16.    During the discussion KING stated, "I think this is was one of y'all's primary interests, I have e-matches being sent from China." KING then described to GOODMAN and the CHS how an e-match works. (Through training and experience, I know an e-match is the abbreviated name for an electric match, which is used in initiating fireworks and can also be used as an initiator in an Improvised Explosive Devices (IED).) KING stated that he gets a lot of his stuff from Parts Express in Springboro. The CHS asked KING how far away is this good for, referring to the metal pipe with two end caps. KING responded,"super close, anti-personnel." The CHS asked, "What's super close?" KING responded, "Let's think grenades, 12 to 15 meters." KING then talked about the weak points on the pipe and GOODMAN commented that the pipes usually split in the seams. KING stated, "Now what you could do is score them with a grinder, before you put it all together." KING then told GOODMAN and the CHS the scoring would be to cause more pieces to come off like a pineapple grenade. GOODMAN responded, "That's a good idea honestly."

17.    KING stated to GOODMAN and the CHS, "We need to figure out a pull tab ignition." KING was referring to the pipe at this time, and continued explaining that the pull tab needed to be out the top. The CHS asked, "But for what? A time delay?" and KING responded,

"Yep time delay you pull it, it ignites something on the inside. I have a fuse inside like small diameter copper tubing that's kinda flexible." KING further explained the device by stating, "You put fuse in on one side, light it here, it runs through the copper down into the core part." The CHS stated, "Ok" and KING said, "So what you do is you put your black powder in there then you pour something on top like foam, I think I used wax, I think to create a barrier between charge and then up top is your ignition system.   Now the one that blew my hand up was electric so all I did was press a button and it had a delay on it. But I don't know if that's super foolproof um I think ripping a pin out is going to be the easiest thing versus hoping that someone doesn't accidentally turn it on during transport."

18.     KING, GOODMAN and the CHS continued talking about design and size of the device, while looking at the pipe and other parts. The CHS asked, "How big would you have to have to set something on driveway to keep someone from coming in or out?" KING responded, "Um so their rule of thumb for that is you don't want it to be more than 8x the diameter." KING went on to explain that if too much black powder is used, it cannot explode fast enough to use all the powder and some powder would be wasted. KING, GOODMAN and the CHS continued talking about the device and KING stated, "This could go under a front seat of a car very easily, engine of a car, wired into the braking." GOODMAN then stated, "I like that, that's my method I like."

19.     KING, GOODMAN and the CHS began talking about wireless relays and how the distance can be increased. Eventually GOODMAN decided to test the wireless relays KING had been showing them and left the house. GOODMAN called KING on a cell phone and GOODMAN began walking away from KING's house and every so often initiated the transmitter to see if it was received by the receiver, which was sitting on the table where KING and the CHS were still

seated. While GOODMAN was gone the CHS asked KING about the size of device needed for something military armored. KING explained to him the pipe they were looking at would disable the vehicle if placed in the tracks. GOODMAN returned to KING's house, and KING then showed a video on his phone. The video demonstrated how to make a pull ring fuse.

20.     KING retrieved a CO2 cartridge from the box, calling it a "crater maker." The cartridge had a fuse coming out of the top hole, with green electrical tape affixed to the hole and fuse. (Through training and experience, I recognized the CO2 cartridge device as a destructive device commonly referred to as a "cricket." A cricket is constructed by filling a carbon dioxide cartridge with energetic powder and a fuse inserted through the opening at the top, with electrical tape wrapped around the top hole to affix the fuse and contain the powder.) The CHS handled the device and believed based on the weight, and how it felt, the device was filled with an unknown substance.

21.     KING, GOODMAN and the CHS were joined by KING's wife at the table. KING had already informed GOODMAN and the CHS that KING's wife knew about his building of destructive devices. The CHS asked KING about a previous device he (KING) had built with BBs. KING told the CHS he, "had a 4" PVC cap, had a coupler set down in it with a 4" wash out on top with a lid. I put a momentary switch on top of that, made a simple circuit with a rocket engine and a 9-volt battery...the whole thing was full of black powder and a one of those milk cartons of BBs." KING admitted he was trying to make a land mine and pulled a cinder block over the device which triggered the momentary switch. KING said the land mine left a "nice crater" and the cinder block was destroyed, but that "the only thing it needs to do is shred somebody's leg." KING told GOODMAN and the CHS if he ever had to build them again, it would be out of steel. Later in the evening, at the same party, while KING was alone with the CHS, KING again brought up the topic

of designing a physical "pull-pin" initiation system for an explosive device, saying he wanted to come up with a "simple easy to build solution that was robust."

22.     During the drive home from the party with the CHS, GOODMAN discussed building and testing destructive devices and stated that he was "really looking forward to doing some of that." GOODMAN stated that he could see how a pull-pin initiation system would be functional, but that he would "feel a lot better if I could push a button from three blocks down the street." GOODMAN stated that "schedule 40 PVC pipe may be a good option because it wouldn't cause as many red flags when they bought 20 caps and 6 inch pieces of threaded pipe." GOODMAN went on to say that if they bought PVC, "they would never even think about it."

23.     On December 13, 2018, the CHS, KING and GOODMAN met at a restaurant in Maineville, Ohio. During the meeting KING told the CHS and GOODMAN he received his e-matches from China, in the quantity of 50 or 100. KING also drew a diagram on his phone of a fusing method for a handheld device. During their conversation KING mentioned they should come up with their own design so they could build them "en masse." KING stated, "I think I know of a good place where we can test them," which the CHS believed was in reference to GOODMAN's property. Later in the meeting KING stated they would conduct many tests of the devices, before the devices got "real world experience." The CHS brought up that GOODMAN knew someone close that had "got stuff for your crops," referring to the fertilizer that GOODMAN had previously mentioned he could acquire. KING responded, "I'm all into looking into that if you guys can procure the stuff." The CHS asked if it can be used in the type of devices they had been talking about. KING responded that it would be used in larger quantities, "like in 55 gallon drums." After a discussion about fireworks, KING told a story of testing a "crater maker" in a parking lot and placing a locker door on top of it. KING said it blew it up and over the lights in

the parking lot. GOODMAN asked what type of black powder was good. KING said he uses Pyrodex, which he believed to be better because it was more static resistant and stable. GOODMAN mentioned that he underestimated the "crater maker" that KING had shown them. GOODMAN said that will be one of his first projects and "go get some." KING discussed fuses that could be utilized, their specific burn time, and said he has a "shit ton" or GOODMAN could order them off the internet.

24.     On January 5, 2019, the CHS, KING and GOODMAN met at GOODMAN's residence, **8550 Brown Road, Ripley, Ohio (SUBJECT PREMISES 2)** There was a scheduled Sheepdogs training to take place later that day, but utilizing a private Telegram messenger chat, CHS, KING, and GOODMAN agreed to meet three hours before the scheduled training, to discuss, and possibly conduct testing of destructive devices. The meeting was consensually recorded by the CHS with both audio and video recording devices. The majority of the meeting took place inside an outbuilding on the property which the CHS, KING, and GOODMAN referred to as the "milk house".

25.     The meeting began with small talk between the three individuals and continued for several minutes. GOODMAN then started talking about their "Special Projects Team", which consisted of the CHS, GOODMAN, and KING. GOODMAN said they should meet before the mandatory once a month training and stated, "Less we have on electronic devices the better I feel." KING then stated, "The better I feel." GOODMAN retrieved a box and all three individuals placed their cell phones in the box for operational security.

26.     During the meeting, GOODMAN mentioned that the Rural King store had a good selection of plumbing supplies. He stated they have nice "caps and nipples" (referring to metal pipe). KING then asked if they had "black powder", but GOODMAN said they were "running

low." After a few minutes of continued conversation between the three of them, GOODMAN stated, "I'd like to make some hand held ones too, where you just light a fuse and throw it and it's time fuse that would be cool, but pushing a button would be cool too."

27.     The conversation continued with the individuals discussing remote control activation distances and infrared systems. KING stated, "So I bought some on/off switches so if you want to make some shit that you blow up from farther away. You have the on/off switch built into the circuit. Place it, click it on, walk out." GOODMAN and the CHS then discussed the safety switch. After which KING stated, "If you're really worried about it that much, the other thing you could do is put in two remote switches from different manufactures. Click one arms the system, click two detonates. Two different frequencies, that way you're farther away when you switch it on."

28.     KING stated he is not really sure what they need the remote detonation for and told, GOODMAN and the CHS, "We need to develop some shit we can carry on us that we can deploy." Several minutes later KING started talking about how he wants to build them with electric ignition and how you can, "Just press two buttons and you have a small circuit on the inside with a battery, rocket engine or a ignitor, the fuse." KING continued to explain why the buttons need to be protected from accidental activation. GOODMAN asked KING if what he is describing is remote or has a wire to it. KING told GOODMAN there was no wire and continued to describe the device. KING stated, "You need a pipe and on the cap you put two buttons. To complete the circuit you would have to press both buttons" and KING said he would put an on/off switch on the side.

29.     KING and the CHS then talked about the fusing system of KING's device and that conversation continued into discussion about the dismantled fuse the CHS had brought. KING said that the fusing system the CHS brought probably costs around $10.00. KING then stated,

"Circuits I want to build we could probably do for $2.00 or $3.00." Eventually KING produced a box containing different types of fuses. The CHS, KING and GOODMAN discussed the fuses in regards to length and burn time. Two burn tests on the fuse were conducted, the first inside and the second outside, with GOODMAN lighting the fuse each time. After the fuse test GOODMAN picked up a rock and threw it. According to the CHS this was to simulate how far the pipe would go in a certain amount of time. The CHS and KING then discussed what size of pipe would be used. KING then retrieved a pipe from the box that the fuse supplies was in, and showed it to GOODMAN and the CHS.

30.     All three individuals then returned to inside the milk house where KING said, "That will fuck some shit up." GOODMAN then brought up the Boston Bombing and how the bombers used pressure cookers, and set them off with cell phones, and that triggering method "worked for them, if you know what I am saying." KING said he thought that was a horrible idea because "anybody could call that wrong number." KING also stated, "You guys talk a lot about remote detonation, what the fuck you trying to blow up?" GOODMAN then said, "I just would like to have a situation where I know I got something over here, one over here or something and I see a problem, all I got to do is boom." As GOODMAN said "boom" he was seen on video making a pushing motion with his right thumb, as if to be pushing a trigger. KING responded to GOODMAN saying, "Yeah, I think that would be no issue."

31.     Eventually the CHS, KING and GOODMAN went outside where the CHS and GOODMAN each threw a pipe which KING had brought, while KING timed each throw with his watch to determine the proper length of fuse needed. The CHS asked how far it would go in terms of shrapnel. KING commented, "That's gonna fuck some shit up" and the three continued to discuss the shrapnel the pipe exploding would produce. KING stated it would be important to be

behind cover, and described how he envisioned throwing and detonating the devices against persons he was fighting against. At one point KING stated, "It's going to be lethal and if we want, we can pack it with BBs too." KING later described why they should use metal pipe in their design, instead of PVC plastic, because metal would be more lethal. KING stated, "I say if you're throwing that shit out, it because you want to kill." The CHS, KING and GOODMAN briefly returned to the milk house where they continued to talk about the fusing system. They retrieved more fuse and returned to the outside where GOODMAN lit more fuse and KING timed it on his watch.

32.     The CHS, KING and GOODMAN then returned to the milk house where conversation continued regarding the fusing system. Eventually GOODMAN and KING each removed a $CO_2$ device from the box that KING brought. KING confirmed earlier in the day these were the same two "Crater Makers" he had shown GOODMAN and the CHS at the prior meeting. GOODMAN agreed to light the one he has, and KING adds and extra length of fuse to it. All three moved to the outside and GOODMAN placed his device behind a large pile of dirt. GOODMAN lit the device and ran back to where KING and the CHS were standing, approximately 25 yards away. The device detonated approximately 40 seconds later, and debris can be heard hitting the surrounding structures. The CHS, GOODMAN and KING walked back to the blast area and surveyed the damage. KING stated, "You can take down a small tree with that."

33.     While walking back to the milk house the CHS mentioned the downfall to the $CO_2$ device is that you have to light a fuse. KING then suggested that you would "not have to use a lighter but a 9v and switch could be taped to it and out it in a project box." GOODMAN said, "Use a rocket engine ignitor, tape the 9v to it, flip the switch on it, set it down and walk." KING responded, "Put a magnet on it, slip it up underneath a car, under the gas tank." KING then

commented that he was not sure if it would penetrate a gas tank. KING and the CHS then go inside the milk house where the CHS asked KING about the magnets again. KING told the CHS, "Get a project box put one or two of those in it, put 9v, switch, rare earth magnet, instant car bomb".

34.     GOODMAN joined KING and the CHS in the milk house where they continued their conversation regarding the building of devices. KING asked if they wanted to light the other $CO_2$ device and GOODMAN and the CHS agreed. KING worked on the device and then handed it to GOODMAN. All three left the milk house and walked to the same dirt pile that was used for the first device. The CHS dug a hole and GOODMAN placed the device in the whole and lit it. The device detonated approximately 9 seconds later. After which, all three returned to the blast area to survey the damage.

35.     The CHS, KING and GOODMAN returned to the milk house. GOODMAN stated, "That's a nice unit I can see me making a bunch of them." KING then tells them he will tell them how to make them. According to the CHS, KING and GOODMAN were talking about making the $CO_2$ devices, or as KING calls them "crater makers". KING explained to them the first step is to puncture the cartridge and let all the air out. The CHS asked, "If it's used up, there's still air in it?" KING responds, "I don't fucking use them, I just buy them to blow them up." KING continued on to explain how to dry the cartridges in the oven, grind the black powder and place the powder in the cartridge. KING disclosed to GOODMAN and the CHS that he made the devices they blew up approximately five years ago.

36.     The remainder of the meeting took place in the milk house with KING, GOODMAN and the CHS all present. They talked about building and testing a device out of the steel pipe, and how to do it safely. KING commented, "If that went off right now full of black powder it would kill probably all three of us." According to the CHS, KING was referring to the

steel pipe and had it in front of him. KING, GOODMAN and the CHS continued their discussion on how to build steel pipe devices, which included the possible use of missile switches. The discussion ended when another member of the Sheepdogs arrived. The CHS observed KING carry the box with fuse supplies, pipe with end caps, which had also previously contained the $CO_2$ devices, to his truck, a 2014 Black Dodge Ram 1500 pickup. This vehicle is currently registered to KING and bears the license plate, GHT5149.

37.     A Sheepdogs training weekend was scheduled for the weekend of January 18, 2109, again at GOODMAN's residence, **8550 Brown Road, Ripley, Ohio**. KING, GOODMAN and the CHS met several hours before the scheduled training to discuss and further design destructive devices. The CHS arrived at GOODMAN's property before KING. The meeting was consensually recorded by the CHS with both audio and video recording devices. Upon arriving in his 2014 Black Dodge Ram 1500 pickup, KING joined GOODMAN and the CHS in the milk house. KING had carried in two boxes which he placed on the table. According to the CHS, KING removed electronic components, battery, electric matches, pipe and tools from the boxes.

38.     After several minutes of small talk KING asked GOODMAN and the CHS if they wanted to see one of the electric matches fire off. GOODMAN agreed and KING provided GOODMAN with an electric match and told him to touch the electric match leads to the battery. GOODMAN attempted this but determined the battery was dead. KING then provided another battery to GOODMAN, who was then able to initiate the electric match. The CHS and GOODMAN then attached fuse to an electric match and then initiated it with a battery causing the electric match and fuse to function. KING then stated, "If you don't need a delay let's say on a remote project you just put that bad boy right into your pipe." According to the CHS, KING was referring to putting fuse directly into a constructed pipe bomb with a remote initiation.

39.    KING, GOODMAN and the CHS spent several minutes discussing initiation systems, including remote control, rocket engine ignitors and fuse. GOODMAN stated he wanted to keep testing with a" nipple and two caps". KING then pulled out a pipe nipple with two caps attached and asked GOODMAN if this is what he was talking about. GOODMAN said it was, but that he wanted to go smaller for testing purposes. KING then explained they have fireworks for testing.

40.    KING then began to build an improvised initiation system, made up of a battery, remote control receiver and transmitter, broken pen shaft, wire, rocket engine ignitor, and bottle rocket. After completion GOODMAN took the improvised initiation system and all three individuals walked outside. GOODMAN walked the system down the driveway and placed it. KING initiated the transmitter and GOODMAN saw a spark but the bottle rocket did not fire. GOODMAN brought the system back and all three returned to the milk house. They determined the rocket engine ignitor was not hot enough.

41.    KING then built a second improvised initiation system, consisting of a battery, remote control receiver and transmitter, broken pen shaft, wire, electric match and a bottle rocket. While building this second system KING cut open a firework and removed the energetic powder. KING placed the powder in tape and attached it to the fuse of the bottle rocket. According to the CHS this was to help with the ignition.

42.    Before leaving the milk house to test the second system, GOODMAN asked, "Do we know how they built the pressure cookers for the Boston bombers, anybody have a clue how that worked other than they remoted them with cell phones? We are talking this same type of concept , I'm assuming with this type of set up a lot of freaking black powder, shrapnel, BB's and whatever they had in it. They called the cell phone number that triggered that off thru the battery

which was in the crock pot and boom." KING said, "What you would have to do is get the voltage from the ringer or the motor to go into a relay and it will take that short amount of voltage and pull it from a battery and shoot it." GOODMAN stated, "Drop the relay from a normally open to a closed relay." KING said "Which is what this guy is doing." While saying this KING pointed to the improvised initiation system he had just built. KING further stated, "They just used something they could trigger from anywhere, whereas we are using this, which is much closer, that's the only difference." GOODMAN responded, "So theoretically if you had a cheap ten dollar cell phone cause it's got its own number, hit a relay to make this same device do a whole bigger job. See what I'm saying? From a lot farther away." KING then continued explaining why he didn't like using cell phones and the possible dangers they present.

43.      GOODMAN retrieved the improvised initiation system and drove it approximately one quarter mile away, according to the CHS. GOODMAN radioed and advised that the system was in place. The CHS then informed KING who then came outside and initiated the transmitter causing the system to function and fire the bottle rocket.

44.      The three individuals returned to the milk house and talked about the success of the test. GOODMAN commented, "If I had a device and put it in a strategic location where I needed to protect an area, all I know is I got to have number one remote with number one rig, boom, I just took care of a bad issue." KING then said, "You could hook anything to this, anything activated by electric, could be a solenoid with air pressure behind it, could be a solenoid with gasoline behind it for a flame thrower, could be an air canon or a regular cannon for that fucking matter."

45.      KING, GOODMAN and the CHS continued discussing about how to utilize the devices and further testing. While pointing at the improvised initiation system KING stated, "You could build these devices with a pipe bomb rigged to it or two, they could just be sitting somewhere

ready to deploy." KING also stated, "I want to focus on making these anti-personnel, I think these will be a lot more useful to us." GOODMAN said, "I don't mind having something I can take my torch lighter and I know I got seven seconds." KING responds, "Might have to do that, super low tech but we might have to do that."

46.     Over the next 45 minutes KING, GOODMAN and the CHS discussed problems with the grenade fusing system, and how they needed to figure out a way to protect the electric switches with a cover, so they can safely transport the pipe bombs. They came up with different cover possibilities and discuss which would work the best. During the conversation GOODMAN suggested making a device out of PVC. KING stated, "It's not going to be near as lethal, if at all." KING went on to explain how there is a much bigger blast when using steel pipe, with the same amount of powder.

47.     The CHS brought up placing pipe bombs across the driveway. KING explained the type of pipe bombs they are discussing wouldn't be used to defend a driveway. GOODMAN said, "I was thinking pressure cookers." KING then stated, "If you really want explosions you would bury these in the driveway, so they go up and out. We can build land mines, I've already built them before, you know that. So we can build those if we need to, but this you would couple with a 5 gallon container of gasoline or diesel fuel." While speaking KING pointed several times to the two pipe end caps on the table. The conversation continued and the three eventually talked about taping devices to aerosol cans. GOODMAN suggested taping an M80 to an ether can would be deadly and KING suggested they could use a crater maker. GOODMAN said he thought the crater makers were impressive and later states "I'm going to make some of them crater makers, I like that."

48.     On February 8, 2019, I received confirmation from the Bureau of Alcohol, Tobacco, Firearms and Explosives, that neither KING nor GOODMAN registered any destructive

device, including the crater makers, with the National Firearms Registration and Transfer Record as they were required to do under the National Firearms Act.

49.     Through my training and experience, and discussions with law enforcement, I know that militia groups and persons affiliated with militia groups and/or conspirators will utilize cell phones, and other electronic devices including computers, electronic mail ("e-mail"), messaging, and social media to conduct their illegal activity and maintain contact with other confederates, conspirators, and criminal associates involved with the planning, and execution of their goals to include, but not limited to, organizing, and engaging in illegal activities related to firearms.

50.     Through my training and experience, and discussions with law enforcement, I know that individuals who seek to acquire through online companies component parts, or materials necessary in constructing, possessing and detonating unregistered firearms use cellphones, computers, and other electronic devices to access these companies through Internet connections. For example, the electronic devices may contain important evidence including communications between co-conspirators and associates describing their intent to purchase such items and commit these crimes. The electronic devices may also contain records of these crimes, such as photographs and audio and video recordings that they may upload and share with others.

51.     As referenced above, there is probable cause to believe that KING and GOODMAN utilize a Telegram messaging application to communicate with one another.

### ***Technical Terms***

52.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

b.    Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

### *Computers, Electronic Storage, And Forensic Analysis*

53.    As described above and in Attachment B, this application seeks permission to search for records that might be found on either SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

54.    *Probable cause.* I submit that if a computer or storage medium is found on either SUBJECT PREMISES there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users

typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

55.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in SUBJECT PREMISES 1 and 2 because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically

23

contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

56.      *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often

requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to examine thoroughly storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

    57.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the

warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

58.     Because several people share SUBJECT PREMISES 1 and 2 as a residence, it is possible that SUBJECT PREMISES 1 and 2 will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## V.

## CONCLUSION

59.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe SUBJECT PREMISES 1 and 2 as described in Attachments A-1 and A-2, contain the fruits, evidence, and/or instrumentalities, as described in Attachment B, Items To Be Seized, in violation of: 18 U.S.C. 371, and 26 U.S.C. § 5861(d). I respectfully request that the attached warrants be issued authorizing the search and seizure of the items listed in Attachment B.

Bradley A. Meeker, Task Force Officer
Federal Bureau of Investigation


Subscribed and sworn to before me this _8_ day of February, 2019.


HONORABLE KAREN L. LITKOVITZ
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### DESCRIPTION OF LOCATION TO BE SEARCHED

A. **765 South Main Street, Franklin, Ohio 45005,** is a two-story grey and white residence with a dark-colored roof. The numbers "765" are on a post on the front porch.



## ATTACHMENT "A-2"

## DESCRIPTION OF LOCATION TO BE SEARCHED

A. **8550 Brown Road, Ripley, Ohio 45167,** is a farm property with a white two-story residence and multiple outbuildings. The structures on the property are located at the end of a long gravel driveway.



## ATTACHMENT "B"

## PROPERTY TO BE SEIZED

A. Explosives:  High explosives, such as TNT, dynamite, C-4 and commercial explosives (KineStik, ANFO, etc.) as well as low explosives such as black powder, Pyrodex, smokeless powder and flash powder.  Homemade (improvised) explosives and their precursor chemicals to include fuels and oxidizers such as ammonium nitrate, fuel oil, nitro methane, phosphorous, peroxides, acids, sulfur, charcoal, perchlorate mixtures, potassium nitrate, acetone and powdered metals such as aluminum and magnesium.  Initiators to include commercial blasting cap, electric match, squib, time fuse, cannon or hobby fuse or improvised initiators.

B. Container and Shrapnel:  Any container used to contain the explosives and or Improvised Explosive Device, such as pipe, end caps, pipe nipples, pressure cookers, or similar materials.  Fragmentation or shrapnel to include nails, screws, nuts, bolts, BBs, lead shot or similar material

C. Fuzing systems and their components: These components include power supplies such as batteries and switches such as clothespin switches, lever/pressure switches, improvised loop switches and other electric or electronic switches.  Additional components to include light emitting diodes (LEDs), relays, timers, wire, solder, radio controlled transmitters and receivers.

D. Manufacturing Tools and Supplies: Tools and supplies used to build/manufacture IEDs to include drills, drill bits, pipe wrenches and other plumbers' tools, vise grips and other pliers, hack saws, grinders, metal files, wire cutters and strippers, welders, soldering irons, glue guns, tar, epoxy, contact cement, tape (electrical, duct, masking, sealing and strapping tape) and other fasteners.

E. Instructional Information:  Documents and instructions relating to the construction of Improvised Explosive Devices (IEDs) and directions on how to manufacture or mix explosive mixtures and compounds.  These documents and instructions are not limited to books, military manuals, diagrams, magazines, journals, internet printouts, articles, videotapes, CDs, DVDs and documents retained on computer hard drives, discs or other computer media.

F. Purchase Documentation:  Documentation of the purchase of the various components of the explosives, bomb or IED. These documents include, but are not limited to, cash register receipts, credit card receipts, credit card statements, invoices, bills and packing slips.

G. Evidence of Prior Testing: Evidence of the testing of IEDs and prior bombings and damage done with bombs and explosives.  This evidence includes, but is not limited to, photographs, videotapes, digital recordings, residue from explosions and fragments from prior detonated devices.

H. All live ammunition believed to contain energetic powder.

I. Electronic devices that can access the internet and, including but not limited to desktop computers, laptops, iPads, tablets, cellular telephones, digital video recording devices and storage media, and any attached storage devices such as thumb drive, external hard drives, CD's, DVD's and SD cards (to include the electronic content of these items).

J. The authorization includes the search of electronic data to include deleted data, remnant data and slack space. The authorization also includes the search of the computer hardware and computer software.